UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RACHEL BANTLE,

                              Plaintiff,

              v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

DECISION & ORDER

15-CV-6497P

## **PRELIMINARY STATEMENT**

Plaintiff Rachel Bantle ("Bantle") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 14).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 13, 15). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

# BACKGROUND

## I.      Procedural Background

Bantle protectively filed for SSI on July 13, 2012, alleging disability beginning on April 26, 2012, due to pelvic pain syndrome, endometriosis, interstitial cystitis, myocardosis, anxiety, panic attacks, depression, arthritis, cystic ovarian disease, and asthma. (Tr. 29, 127, 146).[1]  On October 23, 2012, the Social Security Administration denied Bantle's claims for benefits, finding that she was not disabled.[2]  (Tr. 55-69).  Bantle requested and was granted a hearing before Administrative Law Judge David J. Begley (the "ALJ").  (Tr. 76-78).  The ALJ conducted a hearing on February 19, 2014.  (Tr. 26-54).  In a decision dated June 2, 2014, the ALJ found that Bantle was not disabled and was not entitled to benefits.  (Tr. 11-21).

On July 22, 2015, the Appeals Council denied Bantle's request for review of the ALJ's decision.  (Tr. 1-6).  In the denial, the Appeals Council considered additional evidence submitted by Bantle that primarily predated the ALJ's determination but was not submitted until after the ALJ had rendered his decision.  (Tr. 1-2, 5, 886-910, 911-81).  The additional evidence consisted of records from Wayne Behavioral Health Network, including treatment notes authored by Bantle's licensed clinical social worker, Patricia Nelson-Struck.  (Tr. 911-81).  The additional evidence also included medical records from Strong Memorial Hospital.  (Tr. 886-910).  The Appeals Council concluded that this additional evidence did not "provide a basis for changing the [ALJ's] decision."  (Tr. 2).

Bantle commenced this action on August 19, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Bantle's previous request for benefits was denied on April 26, 2012.  (Tr. 158).

II.    **Medical Opinions of Record**

    A.    **Jennifer Campbell, MD**

On October 18, 2010, Jennifer Campbell ("Campbell"), MD, Bantle's internist, completed an employability assessment relating to Bantle, whom she had been treating for eighteen months.  (Tr. 830-31).  She diagnosed Bantle with pelvic pain, endometriosis, depression, anxiety, interstitial cystitis, and mild asthma.  (*Id.*).  Campbell opined that Bantle had no evidence of mental limitations, but was moderately limited in her ability to perform lifting, carrying, pushing, pulling, and bending.  (*Id.*).

Campbell completed another employability assessment on December 20, 2010.  (Tr. 832-33).  She indicated that Bantle suffered from pelvic pain, endometriosis, depression, anxiety, asthma, and supraventricular tachycardia.  (*Id.*).  Campbell assessed no physical limitations.  (*Id.*).  According to Campbell, Bantle had been receiving mental health treatment at Wayne County Mental Health for the previous three to six months.  (*Id.*).  She opined that Bantle was very limited in her ability to maintain attention and concentration, interact appropriately with others, maintain socially appropriate behavior without exhibiting behavior extremes, and function in a work setting at a consistent pace.  (*Id.*).  She also opined that Bantle was moderately limited in her ability to understand, remember and carry out instructions, and make simple decisions.  (*Id.*).  Campbell opined that Bantle's limitations were expected to last approximately four to six months.  (*Id.*).

On January 17, 2011, Campbell completed another employability assessment form.  (Tr. 834-35).  She opined that Campbell was very limited in her ability to lift and carry objects and moderately limited in her ability to stand, push, pull, bend, see, hear, speak, use her hands, and climb.  (*Id.*).  With respect to Bantle's mental limitations, Campbell assessed that she

was moderately limited in her ability to maintain attention and concentration and function in a work setting at a consistent pace. (*Id.*). She also opined that Bantle was unable to work and referred her for mental health treatment. (*Id.*).

Campbell completed another employability assessment form on June 29, 2011. (Tr. 836-37). She opined that Campbell was moderately limited in her ability to stand, sit, lift, carry, push, pull, bend, and climb. (*Id.*). With respect to Bantle's mental limitations, Campbell assessed that she was moderately limited in her ability to interact appropriately with others, maintain socially appropriate behavior without exhibiting behavior extremes, and function in a work setting at a consistent pace. (*Id.*). She also opined that Bantle was unable to engage in prolonged standing, pushing, pulling, and climbing, and was unable to lift objects greater than ten pounds. (*Id.*).

On February 13, 2012, Campbell again completed an employability assessment form. (Tr. 838-39). She diagnosed Bantle with endometriosis, chronic pelvic pain syndrome, interstitial cystitis, chronic back pain, rheumatoid arthritis, supraventricular tachycardia, palpations, extra valve in heart, panic and anxiety disorder, and "sometimes" depression. (*Id.*). She assessed no physical limitations and opined that Bantle was moderately limited in her ability to interact appropriately with others. (*Id.*).

**B.    Christine Ransom, PhD**

On September 21, 2012, state examiner Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Bantle. (Tr. 508-12). Bantle reported that she was twenty-four years old and had been driven to the examination by her mother. (*Id.*). She reported that she lived with her four-year-old child. (*Id.*). Bantle reported that she had completed high school in a regular educational setting. (*Id.*). She reported that she had been

4

employed as an administrative assistant for approximately one year and had stopped working in 2010 due to mental health difficulties.  (*Id.*).

According to Bantle, she was currently receiving mental health treatment, including medication and counseling, at Wayne County Mental Health for PTSD, panic disorder, and depression.  (*Id.*).  Bantle reportedly experienced and observed sexual molestation by her cousins when she was growing up and in high school began having panic attacks, characterized by palpitations, sweating, breathing difficulties, trembling, and fear.  (*Id.*).  Bantle reported that she currently suffered from nightmares, flashbacks, intrusive thoughts, and anger.  (*Id.*).  She also had sleep difficulties.  (*Id.*).  Bantle indicated that she was experiencing decreased appetite, frequent crying spells, irritability, low energy, preoccupation with problems, and difficulty concentrating.  (*Id.*).

Bantle reported that she socialized with a few friends and with her mother.  (*Id.*).  Bantle spent most of her day resting and caring for her son, although at times she had to crawl to do so.  (*Id.*).  Bantle denied generalized anxiety, manic symptomatology, thought disorder, cognitive symptoms, and deficits.  (*Id.*).

Bantle reported that pain made it difficult for her to attend to personal hygiene and household chores, including cooking, laundry, and shopping.  (*Id.*).  According to Bantle, her mother sometimes assisted her with these tasks and with managing her money because she had difficulty focusing.  (*Id.*).  Bantle reported that she had a driver's license, but did not have a car.  (*Id.*).  She was able to care for her child.  (*Id.*).

Upon examination, Ransom noted that Bantle appeared casually dressed, although unkempt and poorly groomed.  (*Id.*).  She noted that Bantle's motor behavior was lethargic and her eye contact was downcast.  (*Id.*).  Ransom opined that Bantle had slow, halting speech with a

clear voice that was moderately to markedly dysphoric, irritable, labile, intense, and anxious, and adequate language, coherent and goal-directed thought processes, moderately to markedly dysphoric, irritable, labile, intense, and anxious affect and correlating mood, clear sensorium, full orientation, good insight, good judgment, and average intellectual functioning. (*Id.*).  Ransom noted that Bantle's attention and concentration appeared to be mildly impaired due to emotional disturbance and anxiety. (*Id.*).  According to Ransom, Bantle could count backwards from ten and complete two out of three simple calculations, but had difficulty completing the serial threes. (*Id.*).  Bantle's immediate memory skills appeared mildly impaired due to emotional disturbance and anxiety. (*Id.*).  According to Ransom, Bantle could recall one out of three objects immediately, one out of three objects after delay, and could complete three digits forward and two digits backward. (*Id.*).

According to Ransom, Bantle could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule and learn simple new tasks, but would have moderate to marked difficulty performing complex tasks, relating adequately with others, and appropriately dealing with stress. (*Id.*).  According to Ransom, her difficulties stemmed from PTSD, currently moderate to marked, major depressive order, currently moderate to marked, and panic disorder with agoraphobia, currently moderate to marked. (*Id.*).  Ransom opined that the results of the evaluation were consistent with Bantle's allegations. (*Id.*).

C. **Harbinder Toor, MD**

On September 21, 2012, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination. (Tr. 513-18).  Bantle reported suffering from endometriosis, interstitial cystitis, bleeding cyst, chronic pelvic and abdominal syndrome,

chronic lower back pain, possible rheumatoid arthritis, supraventricular tachycardia, depression, panic attacks, anxiety attacks, asthma, and a history of seizures.  (*Id.*).

Bantle reported that she cooked twice a week, cleaned the house twice a week, and was able to do laundry, shop, and care for her child.  (*Id.*).  She showered and dressed daily with assistance.  (*Id.*).  She reportedly enjoyed watching television and light reading.  (*Id.*).

Upon examination, Toor noted that Bantle had an abnormal gait and appeared to be in moderate pain.  (*Id.*).  She declined to attempt the heel and toe walk or squatting.  (*Id.*).  Bantle needed assistance to change for the examination and had difficulty getting on and off the examination table and rising from the chair.  (*Id.*).

Toor noted that Bantle's cervical spine showed forward flexion to twenty degrees, lateral flexion and rotation to thirty degrees, and no extension.  (*Id.*).  Toor found that Bantle's lumbar flexion was limited to twenty degrees and her lateral flexion and rotation were limited to twenty degrees bilaterally.  (*Id.*).  The straight leg raise was positive at twenty degrees bilaterally in both the sitting and supine positions.  (*Id.*).  Toor found full range of motion in the shoulders, elbows, forearms, and wrists, with tenderness in the wrists bilaterally, but more on the right. (*Id.*).  He found full movement in the left knee, and the right knee flexion and extension limited to 140 degrees with pain and tenderness.  (*Id.*).  Similarly, he assessed full movement in the left ankle, but plantar flexion limited to twenty degrees, and dorsiflexion limited to ten degrees in the right ankle with tenderness.  (*Id.*).  Toor assessed that Bantle's hand and finger dexterity was intact in the left hand, but not the right hand.  (*Id.*).  Bantle's grip strength was four out of five in the right hand and five out of five in the left hand.  (*Id.*).  He noted mild difficulty grasping, holding, writing, tying shoes, zipping a zipper, buttoning a button, manipulating a coin, and holding objects with the right hand.  (*Id.*).

Toor opined that Bantle had moderate to severe limitations standing, walking, bending, and lifting, and that pain interfered with her balance. (*Id.*). He also assessed moderate limitations with sitting for a long time. (*Id.*). Toor indicated that Bantle suffered from mild limitations grasping, holding, writing, tying shoelaces, zipping a zipper, buttoning a button, manipulating a coin, and holding objects. (*Id.*). According to Toor, pain interfered with Bantle's physical routine, and she had moderate limitations during exertion due to supraventricular tachycardia, causing associated chest pain and shortness of breath. (*Id.*). Toor also indicated that Bantle should avoid irritants or other factors that precipitate her asthma. (*Id.*).

    **D.**    **R. Noble, Psychology**

M. Parr, the disability analyst evaluating Bantle's claim for benefits, requested medical advice from non-examining agency medical consultant Dr. R. Noble ("Noble"). (Tr. 522-24). Parr noted a previous determination of non-disability dated April 26, 2012, and requested Noble to review the updated consultative examination and medical records to determine whether the previous determination should be reconsidered. (*Id.*). On October 11, 2012, Noble responded, indicating that he had reviewed Ransom's report and Bantle's treatment records from Wayne Behavioral Health from February through July 2012. (Tr. 59-60). Noble also reviewed a consultative examination conducted in March 2012 in connection with Bantle's previous claim for benefits. (*Id.*). According to Noble, treatment records from June 22, 2012, suggested that Bantle was unable to work, although progress notes from July 2012 indicated improvement with medication. (*Id.*). He requested that the analyst attempt to obtain updated information from the treating psychiatrist regarding Bantle's current mental status and the extent to which the note suggesting inability to work was based upon psychiatric symptoms as opposed to medical and parental stressors, as well as the expected duration of Bantle's inability to work.

(*Id.*).  Although a request for further information was apparently made to Wayne Behavioral Health on October 12, 2012 (Tr. 59, 619), the analyst was evidently unable to obtain additional information (Tr. 65-66, 534-35).

On October 22, 2012, Noble completed a Psychiatric Review Technique. (Tr. 60-61).  Noble concluded that Bantle's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Noble, Bantle suffered from mild limitations in her activities of daily living, and moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace.  (*Id.*).  According to Noble, Bantle had not suffered from repeated episodes of deterioration.  (*Id.*).  Noble completed a mental Residual Functional Capacity ("RFC") assessment.  (Tr. 63-66).  Noble opined that Bantle suffered from moderate limitations in her ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in a work setting, and travel in unfamiliar places or use public transportation.  (*Id.*).  Noble opined that Bantle was mentally capable of performing simple work-related tasks.  (*Id.*).

   **E.**     **I. Seok, MD**

On September 26, 2012, I. Seok ("Seok"), MD, a non-examining agency medical consultant, completed a physical RFC assessment of Bantle's physical ability to perform

work-related tasks.  (Tr. 62-63).  Seok assessed that Bantle could occasionally[3] lift ten pounds

and frequently[4] lift less than ten pounds.  (*Id.*).  Seok also assessed that Bantle was capable of

standing or walking up to two hours and sitting up to six hours of an eight-hour workday.  (*Id.*).

Seok opined that Bantle was unlimited in her ability to push and pull and was limited to frequent

climbing of ramps, stairs, ladders, ropes and scaffolds, and frequent postural limitations,

including balancing, stooping, kneeling, crouching and crawling.  (*Id.*).

### F.    Ralph Madeb, MD

On January 9, 2013, Ralph Madeb ("Madeb"), MD, completed a Interstitial

Cystitis RFC Questionnaire.  (Tr. 660-64).  Madeb indicated that he had provided treatment to

Bantle for interstitial cystitis between May 2011 and March 2012.  (*Id.*).  According to Madeb,

Bantle's condition caused her to experience urinary frequency, bladder and pelvic pain, and

urinary urgency.  (*Id.*).  He opined that Bantle's impairment had not lasted and was not expected

to last in excess of twelve months and that her anxiety contributed to the severity of her

symptoms and functional limitations.  (*Id.*).  He indicated that Bantle would rarely[5] experience

symptoms severe enough to interfere with the attention and concentration needed to perform

simple tasks, although she would need to urinate approximately every two hours.  (*Id.*).  He

opined that Bantle would need ready access to a restroom and would need to take unscheduled

restroom breaks during the workday, but would be able to provide approximately ten to fifteen

minutes notice of the need for a break.  (*Id.*).

---

[3]  "Occasionally" meant cumulatively one-third or less of an eight-hour workday.  (*Id.*).

[4]  "Frequently" meant cumulatively more than one-third and up to two-thirds of an eight-hour workday.  (*Id.*).

[5]  "Rarely" meant one to five percent of an eight-hour workday.  (*Id.*).

G.     **Pat Nelson, LCSW**

Pat Nelson, ("Nelson"), LCSW, Bantle's treating therapist at Wayne Behavioral Health, completed a mental RFC evaluation on January 17, 2013.  (Tr. 700-03).  Nelson indicated that Bantle had undergone an intake evaluation on February 7, 2012, had been admitted for outpatient treatment on February 28, 2012, and her last appointment had been on January 17, 2013, the day the form was completed.  (*Id.*).  Nelson assessed that Bantle suffered from generalized anxiety disorder and panic disorder without agoraphobia.  (*Id.*).

Nelson opined that Bantle had a "fair"[6] ability to comprehend and carry out simple instructions, respond appropriately to supervision, function independently on a job, exercise appropriate judgment, abide by occupational rules and regulations, make simple work-related decisions, and be aware of normal hazards and make necessary adjustments to avoid those hazards.  (*Id.*).  Nelson further opined that Bantle had a "poor"[7] ability to remember work procedures, remember detailed instructions, respond appropriately to coworkers, complete a normal workday on a sustained basis, concentrate and attend to a task over an eight-hour period, maintain social functioning, and tolerate customary work pressures in a work setting, including production requirements and demands.

According to Nelson, Bantle suffered from chronic physical pain and anxiety and depression that affected her judgment, social functioning, and overall ability to work.  (*Id.*).  Nelson also opined that Bantle reacted poorly to stress and her condition was likely to deteriorate in stressful situations.  (*Id.*).  In Nelson's opinion, Bantle was unable to work at the time of the evaluation.  (*Id.*).

---

[6]  "Fair" meant "[t]he ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times."  (*Id.*).

[7]  "Poor" meant no useful ability to function in this area.  (*Id.*).

On February 20, 2014, Nelson completed a form indicating that she continued to assess the same limitations and held the same opinions reflected in her RFC assessment dated January 17, 2013.  (Tr. 879).

## DISCUSSION

### I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)     whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional
capacity to perform any other work that exists in significant
numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

**A.     The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 11-21).  Under step one of the process, the ALJ found that Bantle had not

engaged in substantial gainful activity since July 13, 2012, the application date.  (Tr. 13).  At step

two, the ALJ concluded that Bantle had the severe impairments of endometriosis, interstitial

cystitis, fibromyalgia syndrome, tachycardia, major depressive disorder, generalized anxiety

disorder, and panic disorder without agoraphobia.  (*Id.*).  The ALJ determined that Bantle's

asthma and PTSD were not severe.  (*Id.*).  At step three, the ALJ determined that Bantle did not

have an impairment (or combination of impairments) that met or medically equaled one of the

listed impairments.  (Tr. 14-15).  With respect to Bantle's mental impairments, the ALJ found

that Bantle suffered from no restrictions in activities of daily living and moderate difficulties in

maintaining concentration, persistence and pace, and social functioning.  (*Id.*).  The ALJ

concluded that Bantle had the RFC to perform sedentary work, but was limited to occasional

postural limitations, including climbing, balancing, stooping, kneeling, crouching, and crawling,

and required ready access to a bathroom.  (Tr. 15-19).  The ALJ also concluded that Bantle was

limited to work "that is simple, routine and repetitive tasks, involving only simple work related

decisions, with few, if any, work place changes," and requiring only occasional interactions with coworkers and supervisors and no interaction with the general public. (*Id.*). At steps four and five, the ALJ determined that Bantle had no past relevant work, but that other jobs existed in the national economy that Bantle could perform, including the positions of assembler/bench worker, inspector, and packer. (Tr. 19-21). Accordingly, the ALJ found that Bantle was not disabled. (*Id.*).

> ### B.    Bantle's Contentions

Bantle contends that the ALJ's RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 13-1). First, Bantle maintains that the ALJ erred in evaluating the medical opinions of record. (*Id.* at 24-35). Specifically, Bantle argues that the ALJ failed to adequately develop the record because he did not obtain treatment notes from Nelson and Campbell; she also argues that the Appeals Council erred when it concluded that consideration of Nelson's treatment notes would not have altered the ALJ's decision. (*Id.*). Finally, Bantle maintains that the ALJ's credibility analysis was flawed. (*Id.* at 35-41).

## II.    Analysis

> ### A.    Evidentiary Gaps and Records Submitted to the Appeals Council

Bantle argues that the ALJ failed in his duty to adequately develop the record by not requesting treatment records from Campbell and Nelson. (Docket # 13-1 at 29-30). The government counters that the record was complete at the time of the hearing and the ALJ had no duty to further develop the record. (Docket # 15-1 at 16-17). Having reviewed the record, I agree with the government.

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013). Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386). Accordingly, before determining whether the ALJ's conclusions are supported by substantial evidence, a court must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see also Archbald v. Colvin*, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that 'all of the relevant facts [are] sufficiently developed and considered'") (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010)). "The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment." *Ramos v. Colvin*, 2015 WL 925965, *9 (W.D.N.Y. 2015) (internal quotations omitted).

The record demonstrates that records were requested from both Campbell and Wayne County Mental Health, where Nelson was employed. (Tr. 59). Indeed, two requests for information were addressed to Wayne County Mental Health. (*Id.*). Nothing in the record suggested that further attempts to obtain more information from these sources would have been successful. Accordingly, I conclude that the ALJ did not err by failing to further develop the record.

Subsequent to the ALJ's decision, Bantle's legal counsel did obtain additional records from Wayne County Mental Health and submitted them to the Appeals Council.  (Tr. 4, 911-81).  The records contained treatment notes from Nelson for the period between February 2012 and June 2014.  (*Id.*).

The regulations require the Appeals Council to consider "new and material" evidence "if it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b) and 416.1470(b); *see Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  The Appeals Council, after evaluating the entire record, including the newly-submitted evidence, must "then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence currently of record."  20 C.F.R. §§ 404.970(b) and 416.1470(b); *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010).  "If the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision," although the "[n]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Perez v. Chater*, 77 F.3d at 45).  The reviewing court's task then is to determine "whether substantial evidence supports the ALJ's decision, when the new evidence is included in the administrative record." *Ryder v. Colvin*, 2015 WL 9077628, *4 (W.D.N.Y. 2015).

I find that Nelson's treatment notes, which were submitted by Bantle's attorney to the Appeals Council, could have influenced the Commissioner to reach a different conclusion regarding Bantle's request for benefits.  In his decision, the ALJ gave limited weight to Nelson's opinions because she was not an acceptable medical source and because her treatment records were not in the record.  (Tr. 18).  Although social workers are not considered "acceptable

medical sources" under the regulations, 20 C.F.R. §§ 404.1513(a), 416.913(a), they are

considered "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d), and

their opinions may be used "to show the severity of the individual's impairment(s) and how it

affects the individual's ability to function." *See* SSR 06-03P, 2006 WL 2329939, *2 (2006).

Indeed, Social Security Ruling 06-03P recognizes that "[m]edical sources . . . ,

such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of

the treatment and evaluation functions previously handled primarily by physicians and

psychologists." *Id.* at *3.  The ruling recognizes that such opinions are "important and should be

evaluated on key issues such as impairment severity and functional effects, along with the other

relevant evidence in the file." *Id.*  The ruling directs the ALJ "to use the same factors for

evaluation of the opinions of acceptable medical sources to evaluate the opinions of medical

sources who are not acceptable medical sources, including licensed social workers." *Genovese v.

Astrue*, 2012 WL 4960355, *14 (E.D.N.Y. 2012) (internal quotations omitted).  "An ALJ is not

required to give controlling weight to a social worker's opinion; although he is not entitled to

disregard it altogether, he may use his discretion to determine the appropriate weight." *Cordero

v. Astrue*, 2013 WL 3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5

(N.D.N.Y.) ("the Second Circuit has held that 'the ALJ has discretion to determine the

appropriate weight to accord the [other source's] opinion based on all the evidence before him")

(quoting *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation

adopted*, 2012 WL 1605593 (N.D.N.Y. 2012); *Allen v. Astrue*, 2008 WL 660510, *8 (N.D.N.Y.

2008) (although not an acceptable medical source, "[a]s plaintiff's longtime treating

psychotherapist and the only treating source who evaluated the disabling effects of plaintiff's

mental impairments, [plaintiff's therapist's] opinion was relevant to the ALJ's disability

determination . . . [;] [t]hus, the ALJ should have articulated why he discredited [the therapist's] reports").

According to the ALJ, without the treatment records, the record did not support Bantle's testimony that she received treatment at Wayne Behavioral Health approximately three to four times per month and Nelson's RFC assessment could not be credited.[8]  (Tr. 18).  The treatment records submitted to the Appeals Council would have addressed both issues:  they would have permitted the ALJ to determine the frequency of contact between Nelson and Bantle and to evaluate Nelson's RFC assessments in light of her treatment notes.  Although it is unclear whether review of Nelson's notes would have persuaded the ALJ to give greater weight to Nelson's opinion, the notes would have eliminated the stated basis on which the ALJ discounted Nelson's opinion – that the opinion could not be credited in the absence of the notes.

The ALJ's determination, which discounted Nelson's opinion, explicitly relied upon Noble's opinion – an assessment that was based solely upon his review of the record, rather than his own evaluation of Bantle.  Although the government correctly notes (Docket # 15-1 at 22) that a non-examining physician's opinion may constitute substantial evidence, *see Miller v. Colvin*, 2016 WL 4478690, *13 (W.D.N.Y. 2016) ("the law refutes any suggestion that the opinions of non-examining physicians may never constitute substantial evidence to support an RFC determination"), Noble's assessment in this case rested upon his review of an incomplete record.  Even Noble opined that updated treatment records would assist his analysis.  (Tr. 60).  Indeed, if Noble had reviewed the records submitted to the Appeals Council, he might have

---

[8]  The government suggests that Bantle testified that she treated with *Nelson* approximately three to four times per month and that the additional records submitted to the Appeals Council contradict this testimony.  (Docket # 15-1 at 17).  To the contrary, Bantle testified that she treated with *Wayne Behavioral Health* approximately three to four times per month.  (Tr. 35).  The additional treatment records, reviewed in conjunction with the records before the ALJ, suggest that Bantle was generally scheduled to meet with Nelson twice a month and to attend medication management appointments once a quarter.  (Tr. 867, 911-81).  On this schedule, Bantle well may have attended three appointments in one month at Wayne Behavioral Health.

reached different conclusions regarding Bantle's ability to perform the requirements of simple

work.  Under these circumstances, I cannot say that the ALJ's determination was supported by

substantial evidence.  *See Welsh v. Colvin*, 2016 WL 836081, *12 (W.D.N.Y. 2016) (ALJ's

decision not supported by substantial evidence where it relied upon consulting physician opinion

that was based upon an incomplete record) (collecting cases).

More importantly, if the ALJ had reviewed the additional records and altered the

weight he accorded to Nelson's opinions, which were consistent with some of the limitations

assessed by Campbell and Ransom, the ALJ might also have altered the weights he accorded to

Ransom, Campbell, and Noble.  *See Ryder v. Colvin*, 2015 WL 9077628 at *5 (remanding where

additional evidence submitted to Appeals Council, which included an opinion from a treating

provider, "reasonably would have altered the weight [the ALJ] gave to the consulting opinions,

especially [the non-examining physician's opinion], which was entirely based on a review of the

incomplete evidence in the administrative record").  Accordingly, I conclude that remand is

warranted for reconsideration of the entire administrative record, including the new evidence

submitted to the Appeals Council.

On remand, the ALJ should consider fully Bantle's mental health treatment

records, including the treatment notes authored by Nelson.  The ALJ should reevaluate the

weight, if any, to be given to each of the opinions of Bantle's mental limitations contained in the

record, including the opinions submitted by Noble, Ransom, Campbell, and Nelson, and

recontact those sources for additional information, if necessary.  In his decision, the ALJ should

identify the weight he accords to each of the opinions of record and explain his reasons for

discounting or rejecting any opinions.  *See Lesterhuis v. Colvin*, 805 F.3d at 88 (that treating

physician's opinion is generally entitled to controlling weight does not preclude ALJ from

concluding, upon remand, that opinion is "not entitled to any weight, much less controlling weight, but that determination should be made by the agency in the first instance").

### B.   <u>Weighing Medical Opinions</u>

It is well-settled that in weighing the medical opinions (physical and mental) from treating physicians, the ALJ must consider various factors and should explain and give good reasons for the weight, if any, he assigns to treating physician opinions.  *See Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) ("[a]fter considering the [relevant] factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion") (internal quotations and brackets omitted).  This requires the ALJ to do more than observe in conclusory fashion that certain opinions are generally consistent with the overall evidence of record, while others are inconsistent with that evidence.  *See Ely v. Colvin*, 2016 WL 315980, *4 (W.D.N.Y. 2016) ("the ALJ's statement that the rejected opinions were 'not supported by the record as a whole' is too conclusory to constitute a 'good reason' to reject the . . . opinions[;] . . . [w]ithout identifying the alleged inconsistencies in the record, the ALJ has failed to provide any basis for rejecting [the] opinions") (collecting cases); *Erb v. Colvin*, 2015 WL 5440699, *14 (W.D.N.Y. 2015) (same); *Miller v. Comm'r of Soc. Servs.*, 2015 WL 337488, *22 (S.D.N.Y. 2015) ("[i]n giving 'little weight' to [treating physician's] opinion, the ALJ also reasoned that it was 'inconsistent with the extensive activities of daily living that the claimant was able to perform'[;] . . . [s]uch a conclusory statement, which does not identify which activities are being referenced, is insufficient to meet the ALJ's obligations to 'comprehensively set forth [the] reasons for the weight assigned' to the opinion") (quoting *Burgess v. Astrue*, 537 F.3d at 129). With respect to consultative physicians' opinions, the ALJ should consider the same factors to determine the weight to give those opinions.  *Tomasello v. Astrue*, 2011 WL 2516505, *3

(W.D.N.Y. 2011).  On remand, the ALJ should reevaluate the weight assigned to each opinion of record, explain his reasons for discounting or rejecting any opinions, and explain, with specific references to the record, the manner in which the opinions are consistent or inconsistent with other record evidence.[9]

### C.    Credibility Analysis

Bantle also challenges the ALJ's credibility analysis on the grounds that he failed to provide good reasons for discounting Bantle's testimony and mischaracterized the record. (Docket ## 13-1 at 35-41; 16 at 6-7).  In light of my determination that remand is warranted to permit the ALJ to reevaluate the medical opinions contained in the record, I decline to evaluate whether the ALJ erred in assessing Bantle's credibility.  *See Norman v. Astrue*, 912 F. Supp. 2d 33, 85 n.79 (S.D.N.Y. 2012) ("[b]ecause I find that remand is proper on the basis of the ALJ's failure to properly develop the record and to properly apply the treating physician rule, I do not reach plaintiff's arguments with respect to (1) the ALJ's determination of his RFC at step four and (2) whether the ALJ carried his burden at step five of the analysis[;] [t]he aforementioned legal errors cause the remaining portions of the ALJ's analysis to be inherently flawed"); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 268 n.14 (E.D.N.Y. 2010) ("[b]ecause the [c]ourt concludes that the ALJ erred in applying the treating physician rule, and that a remand is appropriate, the [c]ourt need not decide at this time whether the ALJ erred in assessing plaintiff's credibility").

---

[9] Bantle challenges the ALJ's reliance upon Noble's opinion on the grounds that Noble reviewed and relied upon evidence not contained in the record in reaching his opinion.  (Docket # 13-1 at 26-27).  He argues that Noble relied upon an opinion from Dr. Odysseus Adamides dated June 22, 2012, that was based upon an assessment completed on June 7, 2012, and upon a consultative examination report completed in March 2012 in connection with Bantle's previous claim for benefits.  I agree with the government (Docket # 15-1 at 13) that Noble's opinion referenced a treatment note authored by Sandi Grant, NP, and countersigned by Odysseus Adamides, MD, which is contained in the record.  (Tr. 507).  The March 2012 consultative opinion, by contrast, does not appear to be contained in the record.  Noble cited it only for the proposition that Bantle had previously reported an ability to manage her money.  (Tr. 65-66).  As the ALJ concluded that Bantle was capable of paying her own bills (Tr. 14, 19), he should revisit that issue on remand, and if he still reaches the same conclusion, he should cite evidence in the record that supports his conclusion.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 15**) is **DENIED**, and Bantle's motion for judgment on the pleadings (**Docket # 13**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February 24, 2017